Final case for argument this morning is 24-1996, 4DD Holdings v. United States. Mr. Geiser, good morning. Please proceed. Good morning. Thank you, Your Honor. May it please the Court, Dan Geiser for 4DD. Contrary to the trial court's view, there was no need to conduct a hypothetical negotiation when the party's actual negotiation established the real-world value of relevant pricing in a free and fair market, negotiating at arm's length, and doing so against the backdrop of a planned worldwide deployment of cutting-edge software designed to solve a billion-dollar problem. Let's just assume we disagree with that argument. What's your backup argument for reversing or vacating the damages award, and what should we instruct the trial court to do if we think that, for instance, looking at the quick termination was improper? Well, I'm concerned here because I, you know, you can make that other argument to my colleagues, but I'm not buying that argument. There's no way. That would be a huge windfall to your company. It would not be consistent with the Fifth Amendment kind of purpose of getting the value of your property. You're not going to convince me that you get actual license fees for every single multiple copy. So what is, if we're going to send this back, what are the boundaries that, or what needs to be re-examined by the trial court? Sure, and I'm going to give the backup argument, but I do hope I get a chance to try to convince you of our primary argument. We've had your briefs, so don't worry. And we've got limited time, so go to the back. Okay. Well, the backup argument, the trial court committed multiple errors, both at sort of a high level and also at a granular level. I think the easiest ones to understand are they first said that the parties would have negotiated for developmental license instead of a production license. That's contrary to the actual government's preference at every single stage of this case. Can I just ask you about that? Was this the developmental license or production license? Because I'm confused. Some of those charts talk about developmental license. Was this clearly a production license versus a development license? Your Honor, it absolutely was. And there's a very easy way to understand that. There is no development license in the real world. It's a product that 4DD would have had to create in order to sell it to the government. So it was contemplated at various stages of the negotiating process, but 4DD never had a development license. The government needed a production license to make sure that they could deploy the software right away. It's also essential for properly debugging the software and making sure it's operational. You can't have the software that doesn't do what it needs to do. If there are any bells and whistles that are turned off, they could deploy it and find out it doesn't work. To agree with you on that, we'd have to find clear error after the two-week bench trial on this point, would we not? You would, Your Honor, but these are clear legal errors. How would we find that clear error? Well, they're legal and logical errors. I do want to make sure that this is clear. Some things are factual findings. Some things are more legal in nature. And so that would be a more of a general review. How about areas? But again, I think the easiest way to find it is that the parties at every relevant stage in the actual negotiations in the actual real world negotiated for a production license. But even if you set that aside, I'll give you an even— The circumstances change so dramatically from the facts that underlay the actual negotiations. How can we assume that the if it would have known that its contractor was going to make these multiple orders of magnitude above what they thought they were going to do, copies, that it wouldn't have insisted on some development licenses and some production licenses? Well, Your Honor, I'm glad you brought that up because this is one of the legal errors instead of the factual errors. The hypothetical negotiation under this court's clear precedent has to take place from an ex-ante perspective. So the question is ex-ante, what would the government have wanted to do? And the government wanted to do exactly what they ended up doing. When the contractor made these copies, it wasn't someone mindlessly sort of hitting a mouse button and replicating the software. This was by design. It was in order for the government to rapidly test and deploy the software. And the subcontractor did this, by the way, with the government's approval. So and I think these are all findings directly in the court's own opinion. But— Does this bleed into this book of wisdom issue? It does, Your Honor. Okay. Can I ask you, I mean, assuming the court below went too far, is this a formulation of how, I mean, of how we would use it, which is we allow reliance on post infringement data only in limited circumstances, where post infringement data can form the fact finder about the party's negotiation procedures at the time of the hypothetical negotiation. That's allowed, right? You're not saying that's not allowed. You're just saying that, you know, you can't use it in a way that would contradict the expectation-based principles of the hypothetical negotiation. Well, Your Honor, I want to make sure I answer the question, so tell me if I'm not. But the way we look at it is the parties are supposed to be put back in the position that they occupied before the first act of infringement, which means in this I think this shows some of the legal errors that the trial court made, that they presumed, according to the trial court, they presumed that this project would not work, that the government, in fact, would terminate 4DD, that, in fact, it would never enter to a production, full production and deployment. Those are all things that— Well, I'm not sure. Did the court actually say the parties at the time would have known that, or he just said because it happened, we can consider it under the book of wisdom? He said because it happened, then I'll take that into account in the hypothetical negotiation, but that's letting parties sort of spin the roulette wheel, see if it lands on red or black and then decide how to bet. That's not the way the book of wisdom works. Okay, but it does have some applicability here, right? Even if you go back to the time in negotiation and people are looking at future expectations, which they're allowed to do if they're negotiating a long-term license that's humongous, right? So they can consider how certain their needs would be in the future and things that might happen in the future that might dislodge the rate that they would agree to precisely at the time of the negotiation, right? Your Honor, but without knowing how those events would actually play out. So what the government could do is— I'm sorry to interrupt, but can the speculativeness of going forward inform the negotiation at the time? In the very way that it actually did in the real world here. I mean, the government was negotiating with 4DD knowing this project could work or not. This was a potential solution to a billion-dollar problem, which again is why I think Judge Hughes, this is not a windfall. This is a critical component. But they didn't negotiate. The first license for it was, relatively speaking, for a minuscule number of cores and for a minuscule amount of money, relatively speaking. And so they weren't at that time deciding how should we spend the $5 billion over the next five or 10 years for thousands and thousands and hundreds and thousands of this. Fair enough, Your Honor. But the true up at that point, the government was negotiating against the backdrop of having committed massive infringement and having used the same software in the same fashion, knowing exactly how they were using it and whether it would work or not. And they still said that the fair market value of this software is the discounted rate that they did in the original contract. And to take you back to the list price, I think this is really important. The government itself certified 4DD's pricing, both at the retail and sort of the wholesale level, as fair and reasonable, commercially fair and reasonable in a free and fair market before any of this took place. And I think part of the misperception here is that the government and my friend on the other side has done a nice job trying to paint 4DD as sort of a small company and it seems a little unusual they come and have these sort of demands. 4DD beat out IBM, Oracle, SAP. If IBM came up to this court and said the government— For the small contract, for the short term small— But they were negotiating though, anticipating a worldwide deployment over a series of years to solve one of the key healthcare issues— But the actual negotiation, you can't say because they entered into this particular contract that necessarily means that the contract would have been the same or your client would have been involved for the kind of global contract that we're talking about going forward. Our client was selected to provide that key interoperability component for this exact program, for this billion-dollar program. And again, the prices were certified by the government itself, ex-ANI, as fair and reasonable. So I do think that that should inform, if anything, at least a hypothetical negotiation. I don't think we should have a situation where the hypothetical negotiation says the parties would have done the opposite of what they actually did in the real world. I do want to give you the just-in-case though, and I'm happy to go back to our primary argument because I actually think that is the right— Stay here a little bit longer at least. Sure. Again, there were damages experts at the trial. You presented all of this to the district court and the district court thought on the— sorry, the court of federal claims, excuse me, thought on the merits that here's how the hypothetical negotiation would go and the government would have all the leverage, et cetera. It just seems like you're just trying to re-argue the facts again here. No, Your Honor. And again, it depends. And I admit it's a little hard because we think that the trial court made multiple errors and some are legal, some are factual. Now, when the trial court said something like the government would have exercised extreme leverage and forced 4DD's hand, then the question is why didn't the government exercise that leverage in the actual negotiations? That should have driven down the price, but it didn't. They did negotiate with leverage and that's why they got the price that they did. They got a discount from the list price. Now, I do want to bring up a key factual point where I think the trial court is wrong because this is an important difference to the outcome and I think it's easy to kind of wrap our heads around. The trial court said that 4DD would have provided the same discount formula on the developmental license that it did on a production license. The record evidence shows that is flatly untrue. If you go to the pricing exercise at every single quote where 4DD had a production license and a developmental license, you could see as the quantities went up on a production license, the price went down. As the quantities went up on the development license, it was static. The development license price was 10% of the production license price. That was the discount. There is no evidence at all. Literally, there's nothing in the record that would support the government's expert's position that the trial court wrongly credited, that somehow 4DD suddenly would have driven down a 90% deduction even lower than that. In fact, the record showed the opposite. Sorry, just one more. On Georgia-Pacific factor 11 is the extent to which the infringer has made use of the invention. I think you agreed there should, well, if we think there should be a Georgia-Pacific analysis here, doesn't that mean at the hypothetical negotiation the parties would have some understanding that the government really wasn't in the end of the day going to use your copyrighted property? Your Honor, I think if you read Georgia-Pacific as requiring that here the court is inviting a conflict with the Sixth Circuit and the Ninth Circuit. The copyright statute protects copying, not use. So it's the government's copying that infringes 4DD's rights and activates the right to compensation. Now, I don't think you even need to get into the Georgia-Pacific factors because, again, that's trying to ask the question, what contract would the parties have negotiated had they negotiated before the first act of infringement? It's a very strange question to act when here the parties did negotiate a contract before the act of infringement. They had three separate data points, each negotiated in a fair market at arm's length, and there is no indication at any point that the government said, you know what, we may not use this, so let's drive down the price. Can I, just for clarification, there's so many issues in this case, I may be mixing them up, but when you say a conflict between the Sixth and the, what other circuit? The Ninth Circuit. The Ninth Circuit. If we were to read our opinions in Gaylord, mainly Gaylord III, I think, as not being limited to licenses between parties other than the ones here, would that in and of itself create the conflict? Is that the conflict you're talking about? No, I was talking about there, actually, there are multiple potential conflicts, unfortunately, but I think, I was referring to the conflict saying if you don't credit compensation for unused copies. The Sixth Circuit said in a square. Can we address that argument in our latest bit management opinion and reject it? No, no, no. Actually, it came out exactly the opposite way. Bit management said that, basically, credited the Sixth and Ninth Circuit's views, but on the facts of that case, they had a license that governed use. It didn't govern copies. And so, bit management actually contrasted that situation with what effectively is this situation. If you have a license that doesn't govern use, but instead governs copies, which is exactly what we have here, then bit management would have come out the opposite way. I see him in my rebuttal time. I don't want to. Thank you. All right. Thank you. Good morning, Your Honors, and may it please the Court. The Court should affirm the Court of Federal Claims' well-reasoned judgment that rejected 40D's multi-billion dollar established royalty theory. It was neither comparable to the infringement in this case, and it wasn't commercially established. With respect to the hypothetical negotiation, the Court of Federal Claims' use of a hypothetical negotiation framework is supported by this Court's precedent. So, I'm going to invite you to do the same thing that I tried to invite your opposing counselor to do. I'm not sure he gave me his answers in. I'm not buying the argument that it has to be the actual license fee, and I think the hypothetical negotiation was correct. But I'm a little concerned about some of the facts that Judge Bruggen—and he did—I mean, Judge Bruggen, great. He did a thorough job on this case. I'm glad I wasn't the trial judge on this case. It was very, very difficult. But in particular, the use of the fact that this contract ended very early seems to me to be the kind of ex-ante stuff you wouldn't normally put into a hypothetical negotiation. And if I find at least that was error, what do you think this case would look like if we send it back for a remand? So, Your Honor, we believe, we contend, that the Court's use of the Book of Wisdom to determine the value of use is completely in accord. No, I understand that. But I'm starting from the premise that certainly the Book of Wisdom is allowed, but the wisdom he allowed is perhaps too much wisdom. And so—and particularly that one point. I do not—I really would struggle with the fact that you're allowed to consider that the parties would have known this was going to end really early in the hypothetical negotiation. That seems to me to be too much and not included within kind of the more narrow Book of Wisdom. So we have to reverse and say you can't consider that. How would the case play out from there? Well, can I take the first part first, which is, you know, we acknowledge that there is this philosophical debate as far as how far the Book of Wisdom can extend and whether it can shed light on what is already known to the parties or whether, as is stated in Fromson, it can completely come in and bring in new facts. Here, especially with respect to the short-term nature of this project, the Court acknowledges that the entire DMICS project was always going to be a stopgap solution, something that would get DHA from basically the short-term to the long-term. So this Tetra federator software, that was simply one small component of the entire short-term project. So I think—and I don't know if Judge Hughes—this is his thought—I don't think we need to suggest that they couldn't look at what the duration, the scope of the going forward would be, was in the minds of the negotiators at the time. But at least I think that's different from what Judge Hughes pointed out in terms of what the Court of Federal Claims did in this case. Just take this subsequent fact and put it onto the negotiation. Your Honor, I think this all plays into how the Court ruled with respect to the value of use. And even if the Court disagrees with how far the Court of Federal Claims stretched to use the book of wisdom with respect to this one particular fact, the standard here is abuse of discretion. And this is simply one fact, and the Court just needs to ask whether the Court's decision was supported by other facts in the record. And so even if the Court's— Okay, we understand those arguments, and I'm happy to let you keep making them if you want to. They're in your brief. The whole point of my question is, presuming we disagree with you and this case is going back, this was messy, it's going to be messy, I don't want to overly frustrate Judge Brueggen by just saying try again. If we have to send it back—I'm not saying we're going to, but if we have to—what do you think would help correct at least what I think are some errors in the way he used the book of wisdom? Your Honor, I think if this was going to be sent back— I'm not asking you to concede, I'm just asking you to give us some advice to give Judge Brueggen clear directions on what has to be done. Because I'm sure if we just say, err, try again, he's going to be really, frustrated with us, and rightfully so. So I think if we send it back, we have to give him, here's what we find incorrect, and some guidance on how to make sure that those errors aren't repeated. I acknowledge that, Your Honor, but the problem is that the Court's precedent has been messy as well, too. You're not going to answer my question, right? I'm getting frustrated with you, too, and I understand you want to say we should just affirm. Start from the premise we are not going to affirm. We are going to send this back. What is the government's fallback best position on what we tell the Court to do when we send this back? Our position, if you were to send it back, would be that the Court should still reach the same conclusion with respect to the value of use. Because it was always known that this was going to be a stopgap solution. Is it your answer that there's other evidence in the record that perhaps the District, the Court of Federal Claims did not call out that would support not looking backwards, but what the expectation, reasonable expectations were at the time the license was engaged in? Yes, Your Honor. Can we see any of that evidence in its actual opinion, or do you concede that that's not what the Court of Federal Claims relied on, at least in this opinion? Yes, you can see it in its opinion, Your Honors. On Appendix 19, that's where the Court talks about how the DMICS program was going to be a stopgap solution to get to the DMSM program. That's in the facts section. On page 822, the Court talks about how all the parties knew that a very serious development effort was necessary before this could even be put in production. This was all known to both parties before the hypothetical negotiation. But he didn't call back on these facts? Not expressly. Okay, can I ask you another question that's kind of related to the Book of Wisdom, which is what the Court of Federal Claims, it's finding that the government would have negotiated for a development license. Can you explain, I mean, the difference between production and development and how he reached the conclusion that it would have only negotiated for a development license? I'm just confused about that issue. Sure, Your Honor. So the best source for learning about the difference between production licenses and development licenses is Appendix page 20994. And what 4DD said in this particular email, and this email was sent. This is the email, okay. Yes, this is the email that was sent during the context of the DMICS competition. So they were competing against other people for the government's business. What they say there is that development licenses enable the user to process or to do development on the software and to process development data, whereas a production license can do both development and production. So it's really, if you think about, for example. But this was a production license. What they had engaged in was a production license. That's what the license purchase was for in 2013. Not a development license. That's correct. But the development licenses were quoted during the DMICS competition. We cite the different quotes. They were considered by the agency in the context of the DMICS competition. Development licenses were always something that was developed. But what the government improperly copied here, and there's no dispute, was production copies of the software. Well, that's a distinction between licenses and actual software. If you think about Microsoft Word, Microsoft will sell you a student version of Word or a business version of Word, and it's the same software. It's just licensed under different licenses. But at the time of the hypothetical negotiation, were both parties under the impression that the Tetra would be used for purposes of fixing the government's inoperability problem? Yes, that's correct, Your Honor. And that's the distinction between an actual negotiation. And no one knew at the time of the hypothetical negotiation that the government would abandon using their software, right? That's correct, Your Honor. But that's the distinction between an actual negotiation and a hypothetical negotiation. But you're saying the hypothetical negotiation, the Court of Federal Claims said it would be exclusively developmental licenses. That's correct. And that's because that's all the agency ever used the software for. That's completely in line with the Gaylord case, where in Gaylord, what had happened is the Postal Service had created a lot of postage stamps, 87 million. And then it wasn't even known when the Postal Service retailed the stamps, how those stamps would be used. Only after they were used by the end customer or retained was that the kind of use that this court said, look, you have to different royalties to and you have to award a royalty that best fits the value of use that becomes clear after the hypothetical negotiation. This is completely in line with what the court said in the Lucent case. In Lucent, the court said, yes, you can use the Book of Wisdom to see the extent of use. But that's only the first chapter in the Book of Wisdom. The next chapter, and this was discussed in Lucent, is you have to see how it was used. What kind of evidence or industry practices in the case of Lucent shed light on the value there? So what the trial court did here is completely in line with the Book of Wisdom use in Gaylord and with the Book of Wisdom use in Lucent. 4DD is arguing that there was clear error in the trial court's findings with respect to production versus development licenses and the discounts on the production licenses. Can you tell me why those were not clear factual errors? Yes. So with respect to the development versus production licenses, both licenses were quoted in the context of the DMICS competition. That's the email. That's the email, but there's also specific quotes that are in the record as well, too, that say, here's production cores and here are development cores. So that was all part of what was offered to the government prior to the hypothetical negotiation. It certainly would have been in the minds of the negotiator. But the court of federal claims said it was not a production license. It was exclusively a development license. That's correct, because the program never entered production, Your Honor. The software was never used to process production data. The use by the agency was only for development purposes. And so with the hypothetical negotiation, the idea is the government would know that, I guess. I guess we're now bleeding into Book of Wisdom. That they'd know they were never going to use it long enough to need a production license. That's at least the trial court's analysis? That's correct, Your Honor. And we would contend that that's completely consistent with Gateward, with management as well, too. Now, turning to the second part of your question of the additional discounts on top of the development licenses, the record is replete with qualitative statements that if the government made a big purchase, 4DD would make an incredible deal, unprecedented discounts. And this is before the hypothetical negotiation, after the hypothetical negotiation. So that's why they're not getting what they're asking for, which is multiplying the actual rate across every copy. I mean, at least not for me. But I'm still a little confused about a lot of this stuff, including the production versus development, because it seems like in the actual agreement that was made, it was for production licenses. And so why would you necessarily assume in the hypothetical negotiation that instead it would have been all development licenses? That was within the court's discretion to arrive at that decision. And it arrived at that decision by looking at how the government had actually used the software, just like Gateward, just like management. But as far as why there is an additional discount with respect to the development license. Is it because, I'm sorry, we don't do a lot of copyright cases, obviously, and this one, particularly with the government overlay, is difficult. Is it because the book of wisdom allows you to consider how generally stuff would have played out, even if you can't look at really specific things that wouldn't have known, and that if the government, if the parties at the time had been negotiating with the idea that the only use of these licenses were going to be for development, they would have priced them lower? That's right, Your Honor. And why are you allowed to attribute the knowledge that they were only factually used for development in a hypothetical negotiation? Why isn't that improper ex-ante knowledge? It's proper because the end destination for the trial court, and for this court, is to arrive at reasonable compensation. And like you say, there could be a windfall unless you allow the trial court to take in this future knowledge and look at how the parties would have negotiated a license in light of this future knowledge at the time of the hypothetical negotiation. So there could be a windfall. You could undercompensate the plaintiff. It's this additional information from the future that can be brought in and helps inform the hypothetical negotiation. And do you never, I don't think you finished answering maybe a question to Judge Stark about the double counting argument on the discount and the volume discount. And I don't understand why you would apply anything. There's a 90 percent discount, right? And then on top of that, there was another discount that the Court of Federal Claims applied? That's right. That's correct, Your Honor. Well, I'm not understanding the basis for having gotten there. Sure. So the volume discount formula was a formula that 4DD advertised and told the competitor or told the government that it applied to its products for purchases. It did not specifically say, we apply this formula to development licenses. But if you look at this court's precedent, such as in the Smith-Kline diagnostics case, which we cite in our brief, what that says is in the context of trying to arrive at reasonable compensation, a court need not cite to or anchor its decision in a particular offer. Oftentimes, a party will come in and say, we want a royalty of 1 percent. The other party says 5 percent. The court will say, well, it's 2 or 3 percent. And here's why it's 2 or 3 percent. It's the same thing here. 4DD walked in the door and they said, if the government makes a large purchase, we will give you an unprecedented deal. And so the trial court is allowed to take that at face value and apply their standard formula to the development license price. Can I, assuming we have some trepidation about not allowing for hypothetical negotiation, do you agree that even in discussing, in thinking about the hypothetical negotiation, an important aspect of that would include the actual license agreements that existed in the parties that already engaged it? Yes. On page 22 of our brief, we say those are absolutely relevant. The issue is really whether they're controlling or not. Thank you. Thank you. Okay, we're going to give you three minutes of rebuttal, because we went over with the other side. Thank you, Your Honor. I'll start out by pointing out the government is, in fact, embracing an ex post negotiations directly contrary to this court's law. If you don't accept our original argument, it will create a direct circuit split. There's not a single court I'm aware of that says you depart from an actual agreement the parties have reached in setting the price. But if we are going to remand for a hypothetical, for redoing the hypothetical negotiation, I think there are a few clear points. There are three specific things I would instruct the judge to do. The first is presume that it is, in fact, a production license. That's what the government insisted upon at every turn. And importantly, during the true up, the government did not say, after engaging a massive infringement in the development process, that the license should be repriced at a development license rate. It agreed that the production license rate applies. So I think that's clear evidence. The hypothetical negotiation doesn't say the parties do the opposite of what they actually did. That doesn't answer the question, though, of whether the production license would have stayed at the same rate if it had been at the same volume that they actually copied it at. Fair enough, Your Honor. I think the list pricing certified as fair and reasonable does that. But I take your point. But I think at least the court should start assuming it's a production license instead of a discount license or development license. If you do disagree and you think it should be a development license, I think clearly the discount formula cannot apply to that. My friend did not give any record evidence that shows that 4DD, even when contemplating development licenses at scale, applied the discount formula on top of that. That was a clear error. There's no record evidence to support that. The third is I would instruct the court to take it into consideration all unused copies. Again, that's unless the court wants to create a direct circuit split with the Sixth Circuit and the Ninth Circuit. The unused copies add value. It made it easier for the government to replicate the software. If you look at the Wall Street or the wall data opinion from the Ninth Circuit, it's the exact same scenario here. There, the government, and it was a government entity. There was the L.A. Sheriff's Department. Yeah, but just to be clear, on the circuit split, weren't those cases involving multiple license agreements that showed that there was a market rate, which is what led those circuits to that conclusion? That's a different analysis that we would necessarily have to apply in this context? No, Your Honor. And just to be very clear, the Sixth Circuit case said two things. They said, first, unused copies count. Second, apply the market agreement between the parties. They had an actual license between the two parties. That license rate applied to both the used and unused copies indistinguishably. So it would be creating a direct circuit split if the court does not take into account the unused copies. There are also three more general instructions I would give to the trial court. The first is, again, you have to take the city account ex ante. You cannot assume the project would have ended early. And in fact, as we cited in our brief, there's evidence that the government's own agent said, even during the true-up, that the project had promised there was no reason to think the 4DD solution wasn't, in fact, the solution. This, and by the way, was not a stopgap solution in the sense that this was, in fact, a billion-dollar program over a period of multiple years. I'd also instruct the court, if I may just go over just ever so slightly, not to use Rhapsody as an alternative. Again, this is counterfactual. Rhapsody existed during the competition to decide what software it worked. It didn't have the critical interoperability function. The trial court, on his own terms, said, I don't need to decide whether Rhapsody can actually serve the purpose that the government hired 4DD to accomplish. I'm just going to assume there is some alternative somewhere that does something, so I'm going to credit that to drive down the price. That logically doesn't make any sense. And the final point I would say is, again, not to presume counterfactual presumptions. Things like preferring a development license when the government insisted on a production license at every term. Thank you. Thank you, Your Honor. That concludes our proceeding.